IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| GALLAGHER BENEFIT SERVICES, INC. and ARTHUR J. GALLAGHER & CO., <br><br> Plaintiffs, <br><br> v. <br><br> GRANT T. CAMPBELL, A2 HOLDINGS, LLC, ROBERT W. TAYLOR, and KATHRYN T. STORCK, <br><br> Defendants. | Civil Action No. 1:19-cv-00836-SDG |

## OPINION AND ORDER

This matter is before the Court on the following motions: Defendant Kathryn T. Storck's motion for summary judgment [ECF 115]; Defendant Grant T. Campbell's motion for summary judgment [ECF 120]; Defendants Robert W. Taylor and A2 Holdings, LLC's motion for summary judgment [ECF 122]; and Defendants' joint motion in limine [ECF 181]. For the following reasons, and with the benefit of oral argument, Storck's motion for summary judgment is **DENIED**; Campbell's motion for summary judgment is **GRANTED IN PART and DENIED IN PART**; Taylor and A2's motion for summary judgment is **GRANTED IN PART and DENIED IN PART**; and Defendants' joint motion in limine is **GRANTED**.

## I.     BACKGROUND[1]

Gallagher is a nationwide provider of risk management, human capital consulting, and insurance brokerage services.[2] Campbell, Storck, and Taylor are all former Gallagher employees.[3] Prior to his employment with Gallagher, Taylor was the sole owner and President of Argus Holdings, Inc., d/b/a Argus Benefits (Argus), an employee benefits and insurance consulting firm.[4] Campbell and Storck both worked for Taylor at Argus.[5] In late-2012, Taylor sold Argus to Gallagher.[6] After the sale, Taylor became the Area-President of Gallagher's Atlanta office.[7] Campbell and Storck joined Gallagher as a producer and benefits

---

[1]   The parties have filed certain individual exhibits on the docket numerous times in different locations. Some of these exhibits have been filed under seal. The Court does not find that the cited information needs to be sealed, notwithstanding the parties' confidentiality designations.

[2]   ECF 115-4 (Tournet Dep. Tr. 14:24–15:3); ECF 130-1 (Henry Dep. Tr. 11:23–12:1).

[3]   ECF 115-2 (Storck Agreement); ECF 120-2 (Campbell Agreement); ECF 157-3 (Taylor Agreement).

[4]   ECF 190, ¶ 7. *See also* ECF 125-1 (Taylor Dep. Tr. 18:17–21:9).

[5]   ECF 190, ¶ 8.

[6]   *Id*. ¶ 9. *See also* ECF 157-1 (Purchase Agreement).

[7]   ECF 170-2, ¶ 4.

administrator, respectively.[8] All three signed employment agreements containing certain obligations and restrictive covenants.[9]

On June 22, 2016, Taylor resigned his position at Gallagher.[10] After his resignation, Taylor began planning to form a new company.[11] The restrictive covenant period in the Taylor Agreement expired on June 22, 2018.[12] On July 26 2018, Taylor formed A2.[13] After forming A2, Taylor began actively pursuing the accounts and business of Gallagher's clients.[14] Some of the clients signed Broker of Record (BOR) letters to announce their transitions from Gallagher to A2.[15]

While planning his new company, Taylor identified Storck and Campbell as two potential future employees.[16] In February 2017, Storck resigned from Gallagher to join Alliant Insurance Services, Inc. (Alliant), another direct

---

[8]   ECF 115-4 (Tournet Dep. Tr. 16:2–16, 26:16–27:5); ECF 125-4 (Campbell Dep. Tr. 20:15–18); ECF 125-5 (Storck Dep. Tr. 18:12–25).

[9]   ECF 115-2; ECF 120-2; ECF 157-3.

[10]   ECF 170-2, ¶ 5.

[11]   ECF 190, ¶ 22.

[12]   ECF 170-2, ¶ 6.

[13]   *Id*. ¶ 9.

[14]   *Id*. ¶¶ 10, 13.

[15]   *Id*. ¶ 13.

[16]   ECF 190, ¶ 23.

competitor of Gallagher.[17] By March 2018, Taylor and Storck began discussing the latter's future employment.[18] On June 4, 2018, Storck resigned from Alliant to join Taylor.[19] Storck subsequently began servicing some of her former Gallagher clients in her role at A2.[20]

Campbell and Taylor remained in contact after the latter's resignation from Gallagher. For example, in May 2018, Campbell's and Taylor's families went on vacation together.[21] Prior to the trip, Campbell had begun the practice of saving documents on his personal computer and two thumb drives, as well as emailing documents to his and his wife's personal email accounts.[22] And on June 4, 2018—the same day Storck submitted her resignation to Alliant—Campbell's wife exchanged text messages with Taylor stating that it was a "[b]ig day" and asking for Taylor to "let [her] know when the cat's out of the bag."[23] Campbell's wife additionally texted Taylor that he should "[n]ow go build [his] cast of characters"

---

[17]   ECF 169-2, ¶ 13.

[18]   ECF 190, ¶ 24.

[19]   ECF 169-2, ¶ 14.

[20]   ECF 190, ¶ 318.

[21]   *Id*. ¶ 26.

[22]   *Id*. ¶¶ 27, 255.

[23]   *Id*. ¶ 28.

and that she and Campbell were "so thankful to be part of the cast."[24] From May through December 2018, Campbell remained in close contact with Taylor, including discussing Campbell eventually joining A2.[25] On November 29, 2018, Campbell prepared a spreadsheet that contained columns listing (1) the names of 14 then-Gallagher clients, (2) an "action" item, and (3) a section to input notes (hereafter, the Spreadsheet).[26] The Spreadsheet contained entries for certain clients such as "Call>>RT to call" and "Teagan to support."[27]

In December 2018, Campbell began informing some of the clients he personally serviced that he would be leaving Gallagher.[28] Campbell told some clients that he would be joining A2 and, in other instances, either asked permission to provide their contact information to Taylor or told them that Taylor would be in contact to discuss A2.[29] Taylor subsequently contacted many of these clients — some of which had no prior relationship with him — to discuss their businesses.[30]

---

[24] *Id*. ¶ 31.

[25] *Id*. ¶ 32.

[26] *Id*. ¶ 38. *See also* ECF 172-1.

[27] ECF 172-1.

[28] ECF 190, ¶ 48.

[29] *Id*. ¶¶ 48–49, 99, 136, 154–155, 182–183, 229, 235.

[30] *Id*. ¶¶ 52, 102–103, 139, 156–158, 185.

On January 1, 2019, Campbell submitted his resignation to Gallagher.[31] On approximately January 22, Campbell went to work as a producer at A2.[32] According to Gallagher, Taylor, Campbell, and Storck all colluded together to identify, solicit, and service its clients for their own—and A2's—benefit.

Gallagher initiated this action on February 19, 2019.[33] It asserts three claims for: breach of contract (Count I, against Campbell and Storck); tortious interference with contract (Count II, against Taylor and A2); and preliminary injunctive relief (Count III, against Storck).[34] On April 13, 2020, Storck, Campbell, and Taylor and A2 filed three separate motions for summary judgment.[35] On July 6, all Defendants filed a joint motion in limine to exclude certain testimony proffered by Brandon Fuss, Gallagher's corporate representative.[36] On February 13, 2021, the Court heard oral argument from the parties on the outstanding motions.

---

[31]   ECF 170-2, ¶ 17.

[32]   ECF 125-4 (Campbell Dep. Tr. 140:23–241:5).

[33]   ECF 1.

[34]   *Id*. Although asserted as an independent claim for relief, Gallagher never moved for a preliminary injunction and now concedes that Count III is moot.

[35]   ECF 115; ECF 120; ECF 122.

[36]   ECF 181.

II.     **SUMMARY JUDGMENT**

A.     **Legal Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment has the initial burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the non-movant must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324. A fact is considered "material" only if it may "affect the outcome of the suit under the governing law." *BBX Cap. v. Fed. Deposit Ins. Corp.*, 956 F.3d 1304, 1314 (11th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248) (punctuation omitted).

In opposing a motion for summary judgment, the non-movant "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Sears v. Roberts*, 922 F.3d 1199,

1207 (11th Cir. 2019). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). If the non-movant relies on evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Likes v. DHL Express (USA), Inc.*, 787 F.3d 1096, 1098 (11th Cir. 2015). But the Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Sears*, 922 F.3d at 1205 (citing *Anderson*, 477 U.S. at 249). The Court must "view all of the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Newcomb v. Spring Creek Cooler Inc.*, 926 F.3d 709, 713 (11th Cir. 2019). *See also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (quoting *Anderson*, 477 U.S. at 255).

### B.   Discussion

Defendants' motions for summary judgment collectively challenge each substantive claim asserted by Gallagher. Although the facts are intertwined and legal issues often overlap, the Court addresses each motion separately.

### 1.      Storck's motion for summary judgment

Gallagher alleges Storck breached the non-competition and non-solicitation restrictive covenants found in her employment agreement. In Georgia, the elements of a breach of contract claim are "(1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *UWork.com, Inc. v. Paragon Techs., Inc.*, 321 Ga. App. 584, 590 (2013) (citing *Norton v. Budget Rent A Car System*, 307 Ga. App. 501, 502 (2010)). "A breach occurs if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible." *Moore v. Lovein Funeral Home, Inc.*, 852 S.E.2d 876, 880 (Ga. Ct. App. Dec. 21, 2020). *See also Bd. of Regents of the Univ. Sys. of Ga. v. Doe*, 278 Ga. App. 878, 887 (2006) ("A breach of contract may arise in any one of three ways, namely: by renunciation of liability under the contract; by failure to perform the engagement; or by doing something which renders performance impossible.").

The Storck Agreement became effective on January 1, 2013. In Section 8, Storck agreed to "not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult . . . handle . . . or provide" a specified list of services for any account for which she "performed any of [the listed] functions during any part of

the two-year period immediately preceding [her] termination."[37] According to Gallagher, Storck breached these restrictions by (1) soliciting former-Gallagher clients to move their business to A2, and (2) servicing those clients at A2 after the transition. Storck requests summary judgment as to both the non-compete and non-solicitation covenants.

### i.    Gallagher's claim as to the non-compete covenant

Storck contends summary judgment is proper on Gallagher's breach claim based on the non-compete clause because (1) Storck's role at Gallagher did not qualify her as the type of employee that may be held to such a clause, and (2) even if Storck was a covered employee, the non-compete is unenforceable.

### a.    There are triable questions of fact as to whether Storck's role at Gallagher rendered her subject to a non-compete covenant.

Georgia's Restrictive Covenant Act, O.C.G.A. § 13-8-50, *et seq* ("GRCA" or the "Act") governs the enforceability of restrictive covenants in employment agreements. According to O.C.G.A. § 13-8-53(a), the "enforcement of contracts that restrict competition during the term of a restrictive covenant, so long as such restrictions are reasonable in time, geographic area, and scope of prohibited

---

[37]   ECF 115-2, at 6–8 § 8.

activities, shall be permitted." But § 13-8-53(a) is not intended to cover every type of employee. The GRCA states:

> [E]nforcement of contracts that restrict competition after the term of employment, as distinguished from a customer nonsolicitation provision . . . or a nondisclosure of confidential information provision . . . shall not be permitted against any employee who does not, in the course of his or her employment:
>
> (1) Customarily and regularly solicit for the employer customers or prospective customers;
>
> (2) Customarily and regularly engage in making sales or obtaining orders or contracts for products or services to be performed by others;
>
> (3) Perform the following duties:
>
>> (A) Have a primary duty of managing the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>>
>> (B) Customarily and regularly direct the work of two or more other employees; and
>>
>> (C) Have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or
>
> (4) Perform the duties of a key employee or of a professional.

O.C.G.A. § 13-8-53(a).

Gallagher argues Storck's role at the company satisfied §§ 13-8-53(a)(3) and (4). The Court finds genuine issues of fact underlying both sections. With regard to § 13-8-53(a)(3), Storck testified her "duties and responsibilities as a benefits administrator" were to "manage[ ] the benefits administration team."[38] Storck described her day-to-day duties as "manag[ing] a team of people that were benefits administration services."[39] Although Storck reported to a superior, she directly supervised at least five employees.[40] Storck also evaluated prospective candidates and gave hiring recommendations to her supervisor.[41] Storck, conversely, points to evidence that Gallagher is a nationwide company with approximately 33,000 to 34,000 employees.[42] She also disputes whether the benefits administration team in the Atlanta office constitutes a "customarily recognized department or subdivision" of Gallagher.[43] At bottom, the Court finds the parties have submitted disputed, triable issues of fact on this issue.

---

[38]   ECF 172-32 (Storck Dep. Tr. 32:20–33:3).

[39]   *Id*. at 45:21–24.

[40]   *Id*. at 33:7–34:16; 34:21–35:3.

[41]   *Id*. at 50:2–24.

[42]   ECF 115-4 (Tournet Dep. Tr. 14:24–15:3).

[43]   ECF 116, ¶ 10; ECF 190, ¶¶ 295–96.

Storck additionally relies on *CSM Bakery Sols., LLC v. Debus*, No. 1:16-cv-03732-TCB, 2017 WL 2903354 (N.D. Ga. Jan. 25, 2017). The *CSM Bakery* court found a sales representative of a bakery manufacturer to "not . . . [be] covered by the statute" because it did not believe the employee's conduct constituted "the types of activities the Georgia legislature had in mind when requiring that the employee have a primary duty of managing the enterprise." 2017 WL 2903354, at *6 (punctuation omitted). *CSM Bakery* is distinguishable here; Gallagher presents direct evidence raising a genuine issue of fact as to each element of § 13-8-53(a). Finally, Storck's contention that an employee must be a highly ranked executive before she can be held to a non-compete is not supported by Georgia law. *E.g.*, *AWP, Inc. v. Henry*, No. 1:20-cv-01625-SDG, 2020 WL 4548720, at *5 (N.D. Ga. July 17, 2020) (concluding individual employed as a "project manager" of a traffic safety company may be subject to a non-compete clause); *Kennedy v. Shave Barber Co., LLC*, 348 Ga. App. 298, 303 (2018) (finding individual employed as a "master barber" for a barbershop may be subject to a non-compete clause).

The Court additionally finds there are triable issues of fact as to whether Storck satisfies O.C.G.A. § 13-8-53(4). The GRCA defines a "key employee" as:

> [A]n employee who, by reason of the employer's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other

business relationships during the course of the employee's employment with the employer, has gained a high level of notoriety, fame, reputation, or public persona as the employer's representative or spokesperson or has gained a high level of influence or credibility with the employer's customers, vendors, or other business relationships or is intimately involved in the planning for or direction of the business of the employer or a defined unit of the business of the employer. Such term also means an employee in possession of selective or specialized skills, learning, or abilities or customer contacts or customer information who has obtained such skills, learning, abilities, contacts, or information by reason of having worked for the employer.

O.C.G.A. § 13-8-51(8). "[T]o be a key employee for purposes of the Act, an employee must meet the requirements of both sentences of O.C.G.A. § 13-8-51(8)." *Blair v. Pantera Enters., Inc.*, 349 Ga. App. 846, 851 (2019) (finding a backhoe operator who earned $13 per hour to not be a key employee). *See also CMS Bakery*, 2017 WL 2903354, at *6 (finding sales representative did not qualify as a key employee because the employer constituted "an international business with thousands of employees worldwide" and the employee constituted "one of [employer's] lower-ranking employees" who "reported to two supervisors").

Gallagher presents evidence that it considered Storck to be a "critical employee" and "probably the most important employee in Atlanta" who was

"often [clients'] main point of contact."[44] Unlike the situation in *Blair*, Gallagher presents evidence that it invested a significant amount of time and resources into Storck's development and compensation, including paying her a six-figure salary.[45] And at least one client expressly recognized Storck's notoriety and influence by reason of her work for Gallagher.[46] Storck, conversely, reiterates that Gallagher is a large company, that she acted in a minor role relative to its overall operations, and that many clients did not know her.[47] These disputed facts must be weighed by the factfinder. In sum, Storck is not entitled to summary judgment on this issue.

### b.   Client-based, no-servicing non-compete clauses are not per se unenforceable.

At common law, restrictive covenants in employment agreements were difficult to enforce. *PointeNorth Ins. Grp. v. Zander*, No. 1:11-cv-3262-RWS, 2011 WL 4601028, at *3 (N.D. Ga. Sept. 30, 2011). *See also HCC Ins. Holdings, Inc. v. Flowers*, 237 F. Supp. 3d 1341, 1355 (N.D. Ga. 2017) (stating that, under the common law, "Georgia is one of the very few states that has a public policy that has historically

---

[44]   ECF 168-1, ¶ 298.

[45]   *Id.* ¶ 297.

[46]   ECF 171-55 (Moon Dep. Tr. 56:2–20).

[47]   *See* ECF 189, at 6 n.15.

disfavored restrictive covenants"). The GRCA—enacted through an amendment to the Georgia Constitution—represented a sea change. The Georgia General Assembly expressly found that restrictive covenants "serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." O.C.G.A. § 13-8-50. *See also Cunningham Lindsey U.S. LLC v. Box*, No. 1:18-cv-04346-WMR, 2018 WL 10560768, at *6 (N.D. Ga. Dec. 4, 2018) ("Georgia's public policy now favors the enforcement of reasonable restrictive covenants."). Put another way, the GRCA "changed the legal landscape . . . to provide protection for Georgia businesses by allowing greater enforceability of agreements restricting employees' post-employment work activities." *CSM Bakery*, 2017 WL 2903354, at *2. Now, a non-compete clause is generally enforceable so long as it is "justified by a legitimate business interest" and "reasonably restricted in time, geographic area, and scope of prohibited activities." *Heartland Payment Sys., LLC v. Stockwell*, 446 F. Supp. 3d 1275, 1283 (N.D. Ga. 2020). "Whether the restraints imposed by an employment contract are reasonable is a question of law for determination by the court." *Chef Merito, Inc. v. Gonzalez*, No. 1:20-cv-1242-AT, 2020 WL 5548339, at *5 (N.D. Ga. Aug. 19, 2020) (citing *Pan*

*Am Dental, Inc. v. Trammell*, No. 418-288, 2020 WL 2531622, at *3 (S.D. Ga. May 18, 2020); *Uni-Worth Enters. v. Wilson*, 244 Ga. 636, 640 (1979)).

O.C.G.A. § 13-8-53(a) governs the enforcement of "contracts that restrict competition." Conversely, § 13-8-53(b) controls an employee's ability to:

> [A]gree in writing for the benefit of an employer to refrain, for a stated period of time following termination, from soliciting, or attempting to solicit, directly or by assisting others, any business from any of such employer's customers, including actively seeking prospective customers, with whom the employee had material contact during his or her employment for purposes of providing products or services that are competitive with those provided by the employer's business.

The Court must "construe a restrictive covenant to comport with the reasonable intent and expectations of the parties to the covenant and in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." O.C.G.A. § 13-8-54(a). However, the Court cannot "enforce a restrictive covenant unless it is in compliance with the provisions of [§ 13-8-53]." O.C.G.A. § 13-8-54(b). Since the Act is "in derogation of the common law," it "must be limited strictly to the meaning of the language employed, and not extended beyond the plain and explicit terms of the statute." *Belt Power, LLC v. Reed*, 354 Ga. App. 289, 292 (2020).

Storck argues her non-compete is unenforceable for two reasons: (1) the GRCA expressly permits only client-based *solicitation*—not *competition*— clauses, and (2) a restrictive covenant that prohibits an employee from accepting unsolicited business from former customers is unreasonable. The Court does not agree.

First, the Court finds that client-based non-compete covenants are covered by the GRCA. The GRCA has a broad scope and applies to all employment-related restrictive covenants. *Belt Power*, 354 Ga. App. at 293. There is no indication that the Georgia General Assembly intended to exclude client-based non-competes from the scope of the GRCA. Instead, it expressly found that Georgia's public policy now *favors* the enforcement of non-competes.[48] Moreover, the Court

---

[48] To the extent the text of O.C.G.A. § 13-8-54(a) is ambiguous, the Court must apply Georgia's rules of statutory interpretation. *Robbins v. Garrison Prop. & Cas. Ins. Co.*, 809 F.3d 583, 586 (11th Cir. 2015) (holding state, not federal, rules of statutory interpretation govern when analyzing a state statute). "The cardinal rule of statutory interpretation is to ascertain the legislature's purpose in enacting a statute and then construe the statute to effect that purpose, avoiding interpretations that do not square with common sense and sound reasoning." *Ins. Dep't of State of Ga. v. St. Paul Fire & Cas. Ins. Co.*, 253 Ga. App. 551, 552 (2002). *See also Deal v. Coleman*, 294 Ga. 170, 172 (2013) ("When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant."). As stated, in the GRCA, the Georgia General Assembly expressed the policy that reasonable restrictive covenants in employment contracts be enforced. O.C.G.A. § 13-8-50. This further supports a finding that Storck's restrictive covenant is enforceable.

believes this type of non-compete—which would not have prevented Storck from immediately working for any of Gallagher's direct competitors (including A2) so long as she did not service a specific list of clients—is narrowly tailored to fit the reasonable intent and expectations of the parties. *See H&R Block E. Enters., Inc. v. Morris*, 606 F.3d 1285, 1292 (11th Cir. 2010) ("A non-competition covenant must balance an employee's right to earn a living without unreasonable restrictions, and an employer's right to protection from the former employee's possible unfair appropriation of contacts developed while working for the employer.").

Storck's second argument, that client-based, no-servicing[49] restrictive covenants are unreasonable as a matter of law, is similarly unpersuasive. Prior to adoption of the GRCA, courts applying the common law routinely rejected similar restrictive covenants, generally under the guise of a non-solicitation provision. *E.g., Orkin Exterminating Co. v. Walker*, 251 Ga. 536, 538 (1983); *Holland Ins. Grp., LLC v. Senior Life Ins. Co.*, 329 Ga. App. 834, 840 (2014); *Vulcan Steel Structures, Inc. v. McCarty*, 329 Ga. App. 220, 222–23 (2014); *Waldeck v. Curtis 1000, Inc.*, 261 Ga. App. 590, 592 (2003). But Storck's non-compete is governed by the GRCA, not the

---

[49] The Court clarifies that a "no-servicing" restrictive covenant is one that prohibits an employee from accepting business from—or performing work for—customers of her former employer that she did not solicit to come to the employee's new employment.

common law. Two courts have discussed the GRCA's effect on this line of cases.

In *DJR Assocs., LLC v. Hammonds*, the Northern District of Alabama applied

Georgia law—as amended by the GRCA—and extended the common law rule:

> To be enforceable, [a restrictive covenant] must comply with O.C.G.A. § 13–8–53, which provides that such restrictive covenants can only limit the ability of a former employee to solicit customers of the former employer. The employee is allowed to accept business and sell goods and services to the former employer's customers if the employee does not solicit the business and the customers approach him. The covenant at issue in the instant case, however, precludes [defendant-employee's] ability to "sell or attempt to sell" goods and services to [plaintiff-former employer's] customers, even if [employee] does not solicit them. This violates Ga. Code Ann. § 13–8–53.

241 F. Supp. 3d 1208, 1229 (N.D. Ala. 2017). In a footnote, the *DJR* court

acknowledged its relied-on cases were "decided applying the statutory scheme

existing before the enactment of [the GRCA]," but reconciled this by stating that

"the basic rules of law remain essentially unchanged after the new statutory

enactment." *Id*. at 1228 n.7. Notably, the *DJR* court found the common law rule

"is consistent with the language of O.C.G.A. § 13-8-53(b), which provides for

restrictive covenants only that prohibit soliciting, or attempting to solicit

customers of the former employer." *Id*.

The next year, in a factually analogous case to this one brought by Gallagher against multiple former employees based on their alleged breaches of employment agreements identical to Storck's, the Superior Court of Fulton County found the client-based non-compete covenant unenforceable. *Arthur J. Gallagher & Co. v. Ausherman*, No. 2016CV276840 (Ga. Super. Ct. Mar. 27, 2018).[50] Although the *Ausherman* court noted that "[t]his particular issue has not been clearly addressed by a Georgia court since the enactment of the Act," it found the *DJR* decision and pre-GRCA cases persuasive. *Id*. at *6. The court granted summary judgment in favor of the former-employee defendants on Gallagher's breach of contract claim because the "client-based restrictive covenant prohibiting [the individual defendants] from servicing clients who chose to leave [Gallagher] is not authorized by the Act" and was therefore void. *Id*. at *7.

---

[50] On August 28, 2020, the Georgia Court of Appeals summarily affirmed the decision in *Ausherman* without opinion. That decision is not binding on this Court. Ga. R. App. Ct. 33.2 ("A decision that is not officially reported is neither physical nor binding precedent."). *See also Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) ("As a general matter, we must follow the decisions of [state] intermediate courts. But we may disregard these decisions if persuasive evidence demonstrates that the highest court would conclude otherwise.") (citation omitted). Instead, the Court "must predict how the highest court" — *i.e.*, the Georgia Supreme Court — "would decide this case." *Id*. (citing *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1326 n.5 (11th Cir. 2005)).

This Court respectfully disagrees with the reasoning and conclusions drawn by the *DJR* and *Ausherman* courts; there is no indication from the text or legislative history of the GRCA that it does not cover no-servicing non-competes. In this Court's view, the Georgia General Assembly abrogated the common law cases relied on by Storck. As noted by one court in this district: "The new statute sets a standard by which to assess the reasonableness of the restraint and the expectations of the parties. Old cases involving common law interpretations of restrictive covenants are inapplicable here." *Cellairis Franchise, Inc. v. Duarte*, No. 2:15-cv-00101-WCO, 2016 WL 858787, at *3 (N.D. Ga. Mar. 2, 2016) (citation omitted). *See also Becham v. Synthes USA*, 482 F. App'x 387, 391 (11th Cir. 2012) ("This act [the GRCA] directs Georgia's courts to enforce many previously unlawful restrictive covenants."). In sum, the Court concludes that the common law rule no longer controls; client-based, no-servicing restrictive covenants are not unreasonable as a matter of law and may be enforced as long as they meet the requirements set forth in the GRCA.

To enforce a restrictive covenant, "[t]he person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." O.C.G.A. § 13-8-55. The GRCA defines a "legitimate business interest" to include:

(A) Trade secrets, as defined by Code Section 10-1-761;

(B) Valuable confidential information that otherwise does not qualify as a trade secret;

(C) Substantial relationships with specific prospective or existing customers, patients, vendors, or clients;

(D) Customer, patient, or client good will associated with:

(i) An ongoing business, commercial, or professional practice, including, but not limited to, by way of trade name, trademark, service mark, or trade dress;

(ii) A specific geographic location; or

(iii) A specific marketing or trade area; and

(E) Extraordinary or specialized training.

O.C.G.A. § 13-8-51(9). *See also Heartland*, 446 F. Supp. 3d at 1283 (finding that, on motion for preliminary injunction, an employer has a legitimate business interest in protecting its "investment of time and money in developing [an employee's] skills, as well as in protecting its client relationships, goodwill, and confidential and trade secret information from unfair competition."). Here, Gallagher presents evidence that it had a legitimate business interest in "the key people at Argus [ ] sign[ing] restrictive covenant agreements to protect Gallagher's investment in

those relationships."[51] Gallagher also demonstrates that it expended a significant amount of time and resources in Storck and gave her access to its confidential information. That is enough to meet its burden at this stage.

Finally, the restriction must be "reasonable in time, geographic area, and scope of prohibited activities." O.C.G.A. § 13-8-53(a). The Court should consider "the business interests of the employer sought to be protected and the effect on the employee." *Chef Merito,* 2020 WL 5548339, at *5. Two-year restrictive covenants—such as Storck's—are presumptively reasonable. O.C.G.A. § 13-8-57(b). For territorial restrictions, the GRCA requires the Court to presume:

> A geographic territory which includes the areas in which the employer does business at any time during the parties' relationship, even if not known at the time of entry into the restrictive covenant, is reasonable, provided that:
>
> (A) The total distance encompassed by the provisions of the covenant also is reasonable;
>
> (B) The agreement contains a list of particular competitors as prohibited employers for a limited period of time after the term of employment or a business or commercial relationship; or
>
> (C) Both subparagraphs (A) and (B) of this paragraph.

O.C.G.A. § 13-8-56(2).

---

[51]   ECF 131-1 (Gallagher 30(b)(6) Dep. Tr. 154:3–7; 159:6–21).

The Storck Agreement states that it covers the entire United States. Gallagher is not a local or regional business; it services clients—including some Storck handled—on a nationwide scale. Thus, the scope of restrictions on Storck's post-employment work, particularly since it is limited to only a specific list of clients, is reasonable under subsection (A). *See Novelis Corp. v. Smith*, No. 1:16-cv-1557-ODE, 2017 WL 1745635, at *7 (N.D. Ga. Mar. 10, 2017) (granting preliminary injunction and finding non-compete that restricted competition on global scale reasonable due to plaintiff performing services on worldwide level). Therefore, the Court finds that Storck's non-compete is reasonable.

### ii.    Gallagher's claim as to the non-solicitation covenant

Storck argues summary judgment is proper on Gallagher's claim premised on the non-solicitation clause because there is no evidence that she solicited any of the at-issue clients. Storck agreed to not "directly or indirectly" solicit Gallagher's accounts for which she performed specified "functions during any part of the two-year period immediately preceding such termination."[52] The Storck Agreement purported to include a non-exhaustive list of activities considered "direct or indirect solicitation."[53] In the Complaint, Gallagher alleges Storck—as well as

---

[52]   ECF 115-2, at 7 § 8.A.1.

[53]   *Id.*

Campbell—solicited a number of clients.[54] Gallagher has since narrowed that claim and now alleges that Storck solicited three clients: CentricsIT, ERH Shares Services (ERH), and the City of Woodstock (Woodstock).

Storck argues she is entitled to summary judgment on Gallagher's claim as to ERH because it was not a covered client under the Storck Agreement. Storck presents evidence that neither she, nor anyone on her benefits administration team, did work for ERH as to trigger her restrictive covenants.[55] Gallagher, conversely, points to a series of emails between various employees, including Storck.[56] These emails arguably show Storck discussing or performing benefits services for employees at ERH. Thus, there is a triable issue of fact as to whether Storck's work for ERH fell under the restrictive covenants in the Storck Agreement.[57]

---

[54] ECF 1, ¶ 48. In the Complaint, Gallagher alleges both Storck and Campbell solicited this list of clients.

[55] ECF 116, ¶ 16.

[56] ECF 173-26.

[57] A similar issue is raised in all the Defendants' briefing; *i.e.*, they seek summary judgment not only on Gallagher's overall claims, but also as to each specific client. The Court does not believe a client-by-client approach is appropriate. In any event, the Court finds fact issues underlying Gallagher's claims as to each Defendant. If Defendants believe certain clients are not relevant to claims against a specific defendant, they may raise those issues in a motion in limine in advance of trial.

Storck next argues Gallagher has not presented evidence that she solicited CentricsIT, ERH, or Woodstock. "To solicit is to use some sort of salesmanship, to encourage and persuade another to do something." *LifeBrite Labs., LLC v. Cooksey*, No. 1:15-cv-4309-TWT, 2016 WL 7840217, at *8 (N.D. Ga. Dec. 9, 2016). *See also Akron Pest Control v. Radar Exterminating Co.*, 216 Ga. App. 495, 497 (1995) (listing actions that could be considered a solicitation). "An 'indirect' solicitation occurs when the former employee undertakes 'some affirmative action on [her] part that could be considered a solicitation in the broadest possible sense.'" *Sysco Food Servs. of Atlanta, Inc. v. Chupp*, 225 Ga. App. 584, 588 (1997).

Storck submits evidence—including testimony from each of these clients—that Taylor directly solicited the business. In response, Gallagher points to evidence that Storck personally attended—and created documents to be used at—certain "pitch meetings" with Taylor and each client. Storck concedes she attended these pitch meetings, but contends they cannot be considered a solicitation because: (1) Taylor had previously met with each client; (2) each client had already decided to move its business from Gallagher to A2 before the meetings Storck attended; and (3) Storck only attended these meetings to take notes. The Court finds genuine issues of fact precluding summary judgment. Gallagher presents direct evidence that Storck took affirmative acts to help Taylor persuade each of

these three clients to join A2. Whether her involvement with Taylor and these three clients rises to the level of a direct or indirect solicitation requires a weighing of evidence that must be determined at trial.

> ### *iii.* The proximate cause of Gallagher's alleged damages is a trial issue.

To establish its claim, Gallagher must show any alleged breach proximately caused its damages. According to Storck, even if there are triable issues of fact as to whether she breached her employment agreement, she is still entitled to summary judgment because Gallagher has not adduced evidence showing her actions caused the clients to leave. Put another way, Storck avers the clients may have left for a host of different reasons—including service issues with Gallagher, loyalty to Taylor, or Taylor's solicitation of their business—but no reason attributable to any wrongdoing by her.

To be recoverable, "[d]amages growing out of a breach of contract . . . must be such as could be traced solely to the breach, be capable of exact computation, must have arisen according to the usual course of things, and be such as the parties contemplated as a probable result of such breach." *Bauer v. N. Fulton Med. Ctr., Inc.*, 241 Ga. App. 568, 572 (1999). "The question of proximate cause is one for a jury except in palpable, clear, and indisputable cases." *Lankford v. Tr. Co. Bank*, 141 Ga. App. 639, 641 (1977). In *Coffee Butler Services, Inc. v. Sacha*, the Georgia

Court of Appeals found the plaintiff did not present evidence creating a genuine issue of fact showing that the defendant's breach of his employment contract caused any client to defect as to support an award of lost profits. 208 Ga. App. 4, 5–7 (1993). According to the *Coffee Butler* court, the plaintiff provided no information as to "why any of the accounts had left . . . but based their analysis solely on the fact that the accounts left." *Id.* at 7. The plaintiff could not recover damages the cause of which were "vague, speculative, or uncertain" by hoping "the jury might make inferences from the mere fact of the loss of the accounts." *Id.*

At the starting gate, the Court has found genuine issues of fact regarding Storck's breach of her restrictive covenants. At the least, Gallagher may pursue an award of nominal damages. *Owens v. Novae, LLC*, 357 Ga. App. 240, 246 (2020). For the lost profits, the Court believes *Coffee Butler* is distinguishable. Gallagher does not solely rely on the act of clients leaving for A2 and speculate as to Storck's role; it presents direct evidence that Storck attended—and created documents to be used at—client pitch meetings with Taylor. To be sure, Storck presents conflicting evidence. But this must be resolved at trial. In sum, there are triable issue of fact as to whether any of the client defections can be attributable to Storck's actions.

## 2.      Campbell's motion for summary judgment

Campbell signed an employment agreement verbatim in all relevant parts to Storck's. Gallagher alleges Campbell breached his employment agreement by (1) refusing to comply with his contractual obligations during the 21-day Notice Period; (2) violating his contractual duty of loyalty by coordinating with Taylor to influence clients to join A2 while still employed by Gallagher; (3) misusing Gallagher's confidential information; and (4) violating his non-compete clause. Campbell requests summary judgment on each of Gallagher's claims.

### i.      There are genuine issues of fact as to whether Campbell complied with his obligations during the Notice Period.

Section 5 of the Campbell Agreement established a 21-day Notice Period after the termination of employment by which Campbell agreed to "cooperate fully with [Gallagher] in all matters relating to the winding up of any pending work and/or the orderly transfer to other [Gallagher] employees of the accounts for which he has been responsible."[58] During the Notice Period, Campbell's "duties to [Gallagher], including [Campbell's] fiduciary duty of loyalty" remained in effect.[59] Campbell also agreed to "reasonably participate in any meeting

---

[58]    ECF 120-1, at 3.

[59]    *Id*.

[Gallagher] may convene to: (i) review the status of any projects or work [Campbell] has been assigned; [or] (ii) review the status of accounts for which [Campbell] has been most recently responsible or associated . . . ."[60] Gallagher alleges Campbell breached these obligations by refusing to schedule or participate in telephone calls or meetings set by Gallagher to retain or regain its then-current and former clients.

At the outset, the Court agrees with Campbell that Section 5 only required his cooperation with *pending* accounts. Campbell had no obligation to help Gallagher regain business it had already lost, even if the former clients moved to A2. The next issue is whether Campbell refused to participate in the transition of his then-current work for Gallagher. According to Campbell, each client with which he did not meet had already signed a BOR letter alerting Gallagher of its intention to move its business to A2. Gallagher concedes the clients had signed BOR letters, but maintains that its work for those clients did not immediately halt. Gallagher presents evidence that, after issuance of the BOR letters, it provided certain "account management services" through January 31, 2019.[61]

---

[60]  *Id*.

[61]  ECF 172-33 (Murphy Dep. Tr. 261:13–263:24). *See also* ECF 131-50 (Gallagher's Supp. Resp. to Interrog. No. 11).

Campbell avers this is not enough to create a triable issue of fact because Gallagher knew it had been terminated by these clients and produced no evidence identifying the type of services it actually performed.[62] The Court finds this is a disputed issue of fact. Although Gallagher did not articulate the precise contours of the "account management services," this is nonetheless evidence it performed some modicum of work for these clients during Campbell's Notice Period. And it is undisputed that Campbell did not engage with those clients. The ultimate effect of the BOR letters on the status of those clients is an issue for trial.

> ## ii.   There are genuine issues of fact as to whether Campbell breached his contractual duty of loyalty.

In Section 2 of his employment agreement, Campbell agreed "to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities."[63] Campbell warranted that he would "not engage in any activity which conflicts or interferes with, or in any way

---

[62]   Campbell also argues he offered to participate in calls with these clients upon Gallagher's acceptance of certain conditions; that (1) "he understood the substance of the calls"; (2) "Murphy would lead them"; and (3) "there would be a script for what Campbell would say." [ECF 120-1, at 6.] Campbell and Murphy ultimately disagreed as to the substance of the proposed "script" and Campbell did not join any of these calls. Whether this denial constitutes a "refusal to cooperate" is an issue of disputed fact for the jury.

[63]   ECF 120-2, at 2–3 § 2.

compromises, his performance of those obligations and responsibilities."[64] He also agreed not to "directly or indirectly sell, solicit, service, manage or engage in any aspect" of Gallagher's business "for or on behalf of any person or entity other than" Gallagher during his employment.[65] These obligations remained in effect during the Notice Period. Gallagher alleges Campbell breached these obligations by plotting with Taylor to poach its clients while still employed by Gallagher.

Gallagher has not asserted an independent tort claim against Campbell for breach of fiduciary duty. Additionally, the non-solicitation restrictive covenant in Section 8 of the Campbell Agreement is inapplicable to these allegations; that covenant only applies "[f]or a period of two (2) years *following the termination* of [Campbell's] employment."[66] All of the alleged solicitations pointed to by Gallagher occurred *during* Campbell's employment. Thus, Gallagher's sole remedy is through a breach of contract claim premised on the duty of loyalty in the Campbell Agreement.[67]

---

[64]   *Id.*

[65]   *Id.*

[66]   ECF 120-2, at 7 (emphasis added).

[67]   Campbell cites no cases—and the Court finds none—treating a claim premised on a contractual duty of loyalty differently than an independent tort claim. Thus, the Court finds the Georgia decisions discussing the latter type of claim inform the analysis of the former.

In Georgia, "[i]t is well settled that an employee does not breach a fiduciary duty to its employer by making plans to compete, even if those plans are made while the employer-employee relationship still exists." *Hanson Staple Co. v. Eckelberry*, 297 Ga. App. 356, 358 (2009). *See also E.D. Lacey Mills, Inc. v. Keith*, 183 Ga. App. 357, 362–63 (1987). This principal is not unlimited; "[e]ven though he can make plans to compete, however, an employee is not entitled to solicit customers for a rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." *Hanson*, 297 Ga. App. at 359 (punctuation omitted). *See Tom's Amusement Co. v. Total Vending Servs.*, 243 Ga. App. 294, 295–96 (2000) ("[B]efore the end of his employment, no employee may solicit customers for a rival business nor otherwise directly compete with his employer's business."). *See also Impreglon, Inc. v. Newco Enters., Inc.*, 508 F. Supp. 2d 1222, 1232 (N.D. Ga. 2007) ("[Individual defendant's] contacts with current [ ] customers [of his former-employer] in a direct and concerted effort to secure their future business for a rival company . . . violated his obligation to [his former-employer] to act with the utmost good faith and loyalty."). Put another way:

> [T]o present a jury question as to an employee's breach of duty to his employer, there must be evidence from which a jury could conclude that the employee used his position with his employer for his personal gain to his

> employer's injury during the term of his employment,
> such as . . . by soliciting the employer's customers.

*Hanson*, 297 Ga. App. at 260–61.

An employee does not breach his or her fiduciary duty by having innocuous conversations with his or her employer's clients regarding the possibility of the employee resigning to work for a competitor. For example, in *Nilan's Alley, Inc. v. Ginsburg*, the Georgia Court of Appeals granted a former-employee's motion for summary judgment and found that, although the evidence showed the employee had conversations with the employer's customers concerning his future employment, "these conversations were brief, non-specific, and strictly hypothetical." 208 Ga. App. 145, 145 (1993). The *Nilan's Alley* court found the employee "simply inquired of [employer's] customers whether, in the event he left [employer's] employment in the future, they would consider continuing to place their orders through him." *Id.* Specifically, the court found that:

> The evidence is undisputed that [employee] did not profit at [employer's] expense during his actual employment. . . . No agreement was reached with any of [employer's] customers prior to [employee's] termination of his employment. It was only *after* [employee] had already left his employment . . . that, upon being informed of [employee's] actual change of employers, one customer decided to switch from [employer] and place its orders with [employee's] new employer. No existing contract was breached when [employer] lost this customer. This evidence would

> authorize only a finding that [employee's] conversations were in mere preparation for post-employment competition and that [employee] was not thereby in direct competition so as to breach the duties of good faith and loyalty that he then owed to [employer].

*Id*. at 145-46 (emphasis in original).

Similarly, the court in *Hanson* found that the evidence "reflects that [former-employee] did not inform [employer's] customers that he had left [employer's] employ, nor did he solicit their business, until after he resigned." 297 Ga. App. at 359. It was not enough that the former employee "broached the subject of his dissatisfaction with his employer and mentioned the possibility that he might resign to the people he dealt with" at the employer's clients. *Id*. At bottom, there existed "no evidence that [former-employee] used his position to his own gain and to his employer's detriment during his employment." *Id*. at 361. *See also LifeBrite*, 2016 WL 7840217, at *8 ("Surely one does not solicit someone by merely having a conversation. Even mentioning that she was going to work for another [employer] cannot count as a solicitation. . . . Merely informing someone as to a change in circumstances does not qualify.").

Conversely, the *E.D. Lacey Mills* court affirmed the trial court's denial of summary judgment, finding sufficient evidence to create a jury question as to whether the former employees breached their fiduciary duties to their former

employer. 183 Ga. App. at 363. While still employed, the former-employees "admittedly conducted numerous meetings and telephone calls in pursuit of their plans" to compete and "broached the subject of their plans to go into business in competition with [employer] to certain of [the employer's] sales representatives in the months prior to their departure." *Id.* According to that court, this raised triable issues of fact as to whether the former employees solicited customers for a rival business before the end of their employment. *Id. See also Anderson v. USI Advantage Corp.*, No. 19-cv-05582-SCJ, 2020 WL 1933803, at *5 (N.D. Ga. Apr. 21, 2020); *Cunningham Lindsey*, 2018 WL 10560768, at *5.

While still employed by Gallagher, Campbell and Taylor frequently discussed the former leaving Gallagher and joining A2. In late-fall of 2018, Campbell began directly communicating to several clients his intent to leave Gallagher. He expressly informed various clients that he would be joining A2. And for some, Campbell either (1) asked permission to share their contact information with Taylor, or (2) informed them that Taylor would be reaching out to discuss their business. Like *E.D. Lacey Mills*, Campbell's actions as to these clients raise a genuine issue of fact as to whether his conversations crossed the line from hypothetical and innocuous to a direct or indirect solicitation.

Gallagher also points to substantial circumstantial evidence surrounding the Spreadsheet. In their depositions, Taylor and Campbell denied any coordination to solicit Gallagher's clients. However, Gallagher points to evidence that Campbell created the Spreadsheet listing 14 then-current clients that included action items such as "Call>>RT to call." According to Campbell, the Spreadsheet represented his "notes on . . . each account" that contained information on what "may occur, should—or need to occur, should [he] leave" Gallagher.[68] Over the course of the next few weeks, Campbell and Taylor methodically executed each action item for each client listed in the Spreadsheet. And during this time, Campbell and Taylor participated in several conversations in which they discussed Campbell leaving Gallagher and joining A2.

Campbell—as well as Storck, Taylor, and A2—strongly disagree that circumstantial evidence can create a triable issue of fact in this case. According to the Eleventh Circuit:

> Under federal law, an inference must be reasonable to defeat a motion for summary judgment. A reasonable inference is one that a reasonable and fair-minded person in the exercise of impartial judgment might draw from the evidence. Reasonable inferences may rest in part on conjecture, for an inference by definition is at least partially conjectural. But a jury cannot be allowed to

---

[68]   ECF 172-30 (Campbell Dep. Tr. 134:21–24).

> engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such an inference is infirm because it is not based on the evidence.

*Berbridge v. Sam's E., Inc.*, 728 F. App'x 929, 932 (11th Cir. 2018) (citing *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982)) (citations and punctuation omitted).[69] In *Bald Mountain Park, Ltd. v. Oliver*, the Eleventh Circuit explained the interplay between direct and circumstantial evidence. 863 F.2d 1560, 1564 (11th Cir. 1989). According to *Bald Mountain*, "[i]n passing upon a motion for summary judgment, a finding of fact which may be inferred but not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists." *Id.*

Relying on *Bald Mountain* and its progeny, Campbell argues he is entitled to summary judgment because (1) he, Taylor, and each client testified that Taylor—not Campbell—directly solicited the business; and (2) Gallagher's circumstantial evidence surrounding the Spreadsheet has no probative value against that undisputed testimony. The Court does not agree. First, Gallagher does not rely exclusively on circumstantial evidence; there is direct evidence raising a genuine

---

[69]   The Court notes that the cases from Georgia state courts cited by Gallagher are irrelevant; "the sufficiency of evidence to require jury submission in diversity cases is a question of federal law." *Berbridge*, 728 F. App'x at 932.

issue as to whether Campbell solicited at least some clients for Taylor and A2. Second, the Court does not believe the circumstantial evidence pointed to by Gallagher lacks probative value or is based solely on conjecture and speculation. Based on Campbell's (1) constant contact with Taylor regarding joining A2, (2) creation of the Spreadsheet, and (3) the methodical execution of each action item for each client on the Spreadsheet, a factfinder could draw a reasonable inference that Campbell took actions that, in the broadest sense, constituted direct or indirect solicitation. In sum, the Court finds triable issues of fact on this claim.

### iii. Campbell is entitled to summary judgment on Gallagher's claim as to the alleged misuse of confidential information.

Campbell also agreed to "safeguard [Gallagher's] Confidential Information" and that he would "not, at any time during his employment by [Gallagher], divulge such Confidential Information or make use of it for his own purposes or the purpose of another."[70] Campbell warranted that, prior to the lapse of the Notice Period, he would "return to [Gallagher] all originals and copies of . . . documents of any kind which relate in any way to the business of [Gallagher], including specifically all materials which comprise or refer to

---

[70] ECF 120-2, at 3 § 2.B.

[Gallagher's] Confidential Information."[71] Gallagher alleges that Campbell breached his employment agreement by (1) saving documents on his personal computer and two external thumb drives; (2) emailing documents to his and his wife's personal email accounts; (3) not returning documents after termination of his employment.

The Court finds Campbell is entitled to summary judgment on this aspect of Gallagher's claim. Nothing in his employment agreement prevented Campbell from sending or saving documents in this manner. Gallagher presents no evidence that he sent or showed any of these documents to Storck, Taylor, or A2. Although Campbell may have shared client contact information with Taylor or A2 at some point, there is no evidence tying such disclosures to these documents. Gallagher simply speculates as to Campbell's nefarious motives for emailing his wife documents and what he could have done with this information. Moreover, Gallagher presents no evidence that Campbell failed to return any document at the conclusion of his employment. In fact, Campbell deleted each of the emails from his personal email and Gallagher wiped his personal computer

---

[71] *Id*. at 5 § 5.C.

before his termination. Since there is no evidence creating a genuine issue of fact, Campbell is entitled to summary judgment on this issue.

> ### iv.  Gallagher may proceed on its claim as to Campbell's alleged violations of his non-compete covenant.

Like the Storck Agreement, Section 8 of the Campbell Agreement contained a two-year non-compete clause. Campbell argues his non-compete is unenforceable for the same reasons as Storck. As discussed above, the Court believes the non-compete is reasonable and enforceable. To the extent Campbell believes certain clients were not covered by his non-compete, the Court does not find that is an appropriate issue for resolution at summary judgment. Campbell may raise that argument in a motion in limine prior to trial.

> ### v.  Damages

Finally, Campbell reiterates Storck's argument that any alleged breach of his employment agreement did not proximately cause Gallagher's damages. As stated, unlike *Coffee Butler*, the Court finds Gallagher has presented evidence creating genuine issues of fact as to this issue. Therefore, summary judgment is not appropriate.

### 3.     Taylor and A2's motion for summary judgment

Gallagher alleges Taylor and A2 tortuously interfered with the Storck

Agreement and Campbell Agreement by inducing Storck and Campbell to breach

their contractual obligations. Under Georgia law:

> The elements of tortious interference with a contract
> consist of: (1) improper action or wrongful conduct by
> the defendant without privilege; (2) the defendant acted
> purposely and with malice with the intent to injure;
> (3) the defendant induced a breach of a contractual
> obligation or caused a party or third party to discontinue
> or fail to enter into an anticipated business relationship
> with the plaintiff; and (4) the defendant's tortious
> conduct proximately caused damage to the plaintiff.

*Culpepper v. Thompson*, 254 Ga. App. 569, 571 (2002). A plaintiff "must show more

than that the defendant simply persuaded a person to break a contract" and "must

adduce evidence of improper action or wrongful conduct . . . constituting conduct

wrongful in itself." *Kirkland v. Tamplin*, 285 Ga. App. 241, 244 (2007).

Taylor and A2 argue that they are entitled to summary judgment as to

Gallagher's claim premised on both Storck and Campbell. At the outset, once the

restrictive covenant period in his employment agreement lapsed, Taylor possessed

the freedom to aggressively pursue the business of Gallagher's clients.

*E.g., Tom's Amusement*, 243 Ga. App. at 298 ("Fair competition is always legal, and

absent a valid noncompete or nonsolicit covenant a former employee may go to

customers whom he procured for the old employer and endeavor to persuade them to change their trade to his advantage."). What Taylor could not do was induce Storck or Campbell to take actions constituting a breach of their employment agreements.

First, Taylor and A2 are entitled to summary judgment on Gallagher's claim as to Storck. In Georgia, "[a] party cannot intentionally and maliciously induce a breach of a contract of which he or she is unaware." *Medlin v. Morganstern*, 268 Ga. App. 116, 119 (2004). *See also Tom's Amusement*, 243 Ga. App. at 296–97. Taylor and A2 present evidence that they were unaware of Storck's employment agreement or the restrictive covenants contained therein.[72] To rebut this evidence, Gallagher (1) contends that Taylor and A2 cannot rely on information contained in a self-serving affidavit, and (2) points to the affidavit of Kevin Murphy, who became the Area-President for Gallagher after Taylor's resignation. According to Murphy's affidavit, as the Area-President, Taylor should have known Storck would have been required to sign an employment agreement containing restrictive covenants.[73] The Court finds neither argument persuasive. There is no prohibition on a movant relying on a self-serving affidavit to support a motion for summary

---

[72]   ECF 123, ¶ 24.

[73]   ECF 171-38, ¶ 26 (Murphy Declaration).

judgment. Fed. R. Civ. P 53(c); *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) ("An affidavit cannot be conclusory . . . but nothing in Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving."). And there is no indication that Murphy had any insight into Taylor's or A2's actual personal knowledge. It is undisputed that Murphy did not start working at Gallagher's Atlanta office until after Taylor had departed. Murphy's statement is premised only on his own experience and speculation. Thus, since Taylor and A2 present evidence that neither knew of Storck's employment agreement, and Gallagher has not come forward with cogent evidence otherwise, they are entitled to summary judgment on this aspect of Gallagher's claim.

Gallagher's claim regarding Campbell raises a different issue. Taylor and A2 certainly had knowledge of Campbell's employment agreement and restrictive covenants. As stated above, the Court finds the direct and circumstantial evidence create genuine issues of fact as to whether Campbell breached his employment agreement. Specifically, Gallagher presents persuasive evidence concerning the implementation of the Spreadsheet's action items. Gallagher also presents evidence that (1) Campbell and Taylor were in frequent contact during this period, (2) Taylor gained the contact information for each of the clients on the Spreadsheet,

and (3) Taylor himself executed many of its action items. Based on the record, a reasonable factfinder could conclude that Taylor and A2 carefully coordinated with Campbell to poach these clients. *See Carroll Anesthesia Assocs., P.C. v. AnestheCare, Inc.*, 234 Ga. App. 646, 649 (1998) (affirming denial of summary judgment "[i]n light of some evidence of a plan or scheme designed to impair [plaintiff's] financial position and to induce breaches of employment contracts"). Moreover, the Court believes Gallagher has met its burden to show that Taylor and A2 acted with the requisite malice. *Id*. at 648 ("Persuading a person to break a contract for the purpose of benefiting the defendant at the expense of the plaintiff is a malicious and actionable act if injury arises from it.") (punctuation omitted). *See also Insight Tech., Inc. v. FreightCheck, LLC*, 280 Ga. App. 19, 26 n.13 (2006) ("Personal ill will or animosity is not essential."). In sum, Taylor and A2's involvement with Campbell create genuine issues of material fact that preclude summary judgment.[74]

---

[74]   Like Storck and Campbell, Taylor and A2 argue Gallagher has not presented evidence demonstrating the proximate cause of its damages. For the same reasons articulated above, the Court concludes this is a question for trial.

### III.   MOTION IN LIMINE

Defendants jointly request that the Court exclude certain testimony from Brandon Fuss, a Senior Manager of Mergers and Acquisitions in Gallagher's Chicago, Illinois office. Defendants contend Fuss is impermissibly offering expert testimony as to Gallagher's alleged amount and calculation of damages without submitting a report or the necessary disclosures. Gallagher, conversely, argues Fuss's testimony is admissible under Federal Rule of Evidence 701 as a lay, corporate representative.

Rule 701 permits a lay witness to testify as to opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rule 702 permits a "witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion" if his or her testimony meets certain requirements. Fed. R. Evid. 702. According to the Advisory Committee Notes to Rule 701, "the distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which

can be mastered only by specialists in the field." Fed. R. Evid. 701 advisory committee's note to 2000 amendment.

In 2000, Congress amended Rule 701 to include subsection (c) and "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." *United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011). The amendment does not, however, "prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *Id*. The Advisory Committee Notes expressly state that "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert" and that the "amendment does not purport to change this analysis." Fed. R. Evid. 701 advisory committee's note to 2000 amendment. In *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, the Eleventh Circuit affirmed the district court's decision to permit three officers of a shipbuilding company to testify as lay witnesses under Rule 701 as to the reasonableness of an amount billed to a customer for ship repairs. 320 F.3d 1213, 1223 (11th Cir. 2003). That court reasoned that (1) "the testimony . . . was not based on specialized knowledge"; (2) the "witnesses testified based on their particular knowledge

garnered from years of experience within the field"; (3) "[t]heir testimony was helpful to the district judge and relevant to the issues presented in the case." *Id.* Crucially, the officers were directly involved in the repairs process and were responsible for approving the initial quotation for the repairs. *Id.* at 1220.

A corporate officer does not, however, have carte blanche authority to offer his or her lay opinion as to any possible valuation without restraint. At least one court in this district has clarified that "a business owner is not permitted to give lay testimony on matters that go beyond straightforward common-sense calculations." *Kipperman v. Onex Corp.*, No. 1:05-cv-01242-JOF, 2010 WL 11505688, at *21 (N.D. Ga. Sept. 29, 2010). *See also United States v. Hamaker*, 455 F.3d 1316, 1331 (11th Cir. 2006) (finding experienced financial analyst did not need to be certified as an expert witness because the witness "simply added and subtracted numbers from a long catalogue of [defendants'] records, and then compared those numbers in a straightforward fashion"); *Ga. Operators Self-Insurers Fund v. PMA Mgmt. Corp.*, 143 F. Supp. 3d 1317, 1338 (N.D. Ga. 2015) (finding testimony proffered by company's accountant did not constitute expert evidence because the witness "presented simple, grade-school level arithmetic based on the data contained in the actuarial reports" and "engaged in nothing more than clear addition and division exercises").

Other federal courts have found that an officer's valuation testimony is inadmissible under Rule 701 when the calculation "requires more than applying basic mathematics" and involves "[t]echnical judgment." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011). *See also Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 560 (7th Cir. 2008) (preventing corporate president and CEO from offering testimony because "[h]is attempt at valuation was not based on any knowledge obtained through his special relationship with the items in question; instead, he simply looked at a list of items . . . and [ ] estimated their value based on his extensive experience purchasing and selling the type of goods at issue"); *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (preventing corporate president from offering valuation testimony supporting damages model because it "concerned moving averages, compounded growth rates, and S-curves").

Gallagher designated Fuss as its corporate representative regarding damages. Fuss has an accounting degree, is a Certified Public Accountant, and has worked for Gallagher for approximately fifteen years. Fuss had no personal involvement with Gallagher's purchase of Argus or with any of the at-issue clients in this case. During his deposition as the corporate representative, Fuss expressed

the opinion that Gallagher has suffered approximately $4,811,500 in damages. Fuss contends this amount represents what Gallagher would have to spend in the open market to replace the clients that defected to A2. Fuss arrived at this number by calculating the profit for the lost client accounts over the previous year—$566,000, which Fuss characterizes as the "EBITDA"[75]—and increasing it by an 8.5x multiplier. Gallagher contends Fuss may offer this damages calculation as a lay witness because he formed the opinion based on his personal knowledge and experience garnered during his tenure at Gallagher.

The Court does not agree. First, the Court concludes Fuss is offering expert testimony premised on his specialized and technical knowledge. Unlike *Tampa Bay*, Fuss had no personal knowledge of, or involvement with, any of the Defendants or accounts in this case. Instead, Fuss relied on documents and information provided to him. Fuss then made the technical determination to use the former-clients' revenue information from only the prior year to calculate the lost profits. Fuss's calculation of the EBITDA by incorporating and ignoring

---

[75] EBITDA is an abbreviation commonly used for "earnings before interest, taxes, and depreciation and amortization," which includes "[a] company's income without deductions for interest expenses, taxes, depreciation expenses, or amortization expenses, used as an indicator of a company's profitability and ability to service its debt." EARNINGS, BLACK'S LAW DICTIONARY (11th ed. 2019).

specific information—standing alone—is an exercise of technical judgment reserved for the province of an expert witness. Next, Fuss decided to employ an 8.5x multiplier that he derived from (1) data from Marshberry, a third-party source that advises insurance brokers, and (2) a summary of Gallagher's previous transactions from 2017 through 2019 and the multiples it paid to acquire certain books of business. Fuss calculated the average multiple for those transactions— informed by Marshberry's publication—and arrived at the 8.5x figure.

This damages calculation is expert testimony. It is not based on Fuss's perception or any particular knowledge he gained during the ordinary course of his employment at Gallagher. To the contrary, Fuss is explicitly relying on third-party hearsay materials without providing a report. And Fuss is not performing simple mathematics or common-sense calculations. Rather, Fuss used technical and specialized knowledge to calculate both the EBITDA and multiplier. This is the precise type of testimony Congress intended to be excluded under Rule 701(c); "a party may not evade the requirements for expert testimony, set forth in Rule 702, by proffering an expert witness as if he were a lay witness." *United States v. Blackburn*, 398 F. App'x 453, 466 (11th Cir. 2010).

The Court additionally concludes that Fuss's testimony would not be helpful to the factfinder. As Fuss concedes, his damages calculation is premised

on a formula used for purchasing a book of business, not calculating lost profits from a client exodus. As stated by John Tournet—Gallagher's other corporate witness—Fuss's damages model is intended to be "similar to the [Argus] deal we put together," which used an 8.5x multiple, because Gallagher "think[s] [it] should get that same multiple back."[76] There is no indication from Fuss's testimony that a damages model predicated on a formula employed to valuate a book of business for future acquisition is relevant to calculating the lost profits from a departing client. This testimony is more likely to confuse the factfinder than aid its deliberations. Even if Gallagher's desire to recoup some of the money it paid to Taylor were somehow proper as a damages model, Fuss's valuation does not account for any extrinsic value Gallagher received in the Argus deal: namely, the restrictive covenants in the Taylor Agreement.

Gallagher argues Fuss's testimony should not be excluded because Defendants have suffered no prejudice. But prejudice is not relevant to this inquiry; the question is whether Fuss's damages calculation is admissible. And the Court finds it is not. Thus, Fuss cannot testify as to his damages formulation that relies on an 8.5x multiple of the EBITDA. However, this Order does not preclude

---

[76]   ECF 181-2 (Tournet Dep. Tr. 216:2-14).

Fuss from testifying as a lay witness as to matters appropriately within the scope of Rule 701. And Gallagher is not barred from putting on other evidence of its damages at trial, the admissibility or scope of which can be properly addressed at that time.

## IV.    CONCLUSION

Storck's motion for summary judgment [ECF 115] is **DENIED**; Campbell's motion for summary judgment [ECF 120] is **GRANTED IN PART and DENIED IN PART**; Taylor and A2's motion for summary judgment [ECF 122] is **GRANTED IN PART and DENIED IN PART**; and Defendants' joint motion in limine [ECF 181] is **GRANTED**. Within 30 days after entry of this Order, the parties shall file their joint proposed pretrial order.

**SO ORDERED** this the 24th day of March 2021.

Steven D. Grimberg
United States District Court Judge